IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONNA J. BARTLETT,                                          Case No. 1:14-cv-00142-SB

               Plaintiff,                                **OPINION AND**
     v.                                                                 **ORDER**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

_____

BECKERMAN, Magistrate Judge.

     Donna Bartlett ("Bartlett") appeals the Commissioner of Social Security's ("Commissioner")

final decision denying her application for Supplemental Security Income under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. The Court has jurisdiction over Bartlett's appeal

under 42 U.S.C. § 1383(c)(3), which incorporates the review provisions of 42 U.S.C. § 405(g). For

the reasons set forth below, the Court affirms the denial of Bartlett's application for Supplemental

Security Income.

Page 1 - OPINION AND ORDER

## I. FACTS AND PROCEDURAL HISTORY

Bartlett was born in February 1958, and she was fifty-three years old on June 22, 2011, the amended alleged disability onset date.[1] She has a twelfth-grade education and past relevant work experience in general clerical positions arranged by a temporary employment agency. Bartlett stopped working in 2005 and currently serves as the legal guardian of her two grandchildren, ages ten and twelve at the time of the administrative hearing. Bartlett alleges disability and seeks benefits under the Social Security Act, due primarily to pain, swelling, and weakness caused by arthritis in her feet, hips, and hands.

On April 20, 2010, about one month before Bartlett protectively filed her current application, Bartlett visited her primary care physician, Dr. Jason Pilcher ("Dr. Pilcher"), complaining of increased arthritis-related pain and requesting an increased dosage of Vicodin. Although Bartlett appeared in "no acute distress" upon physical examination, Dr. Pilcher nonetheless agreed to adjust Bartlett's Vicodin prescription. (Tr. 246.)

On July 12, 2010, Bartlett completed an Adult Function Report in support of her application for Supplemental Security Income. Bartlett indicated that she takes care of her two grandchildren and has some difficulty with everyday activities, such as personal care, preparing meals, house and yard work, shopping, walking, writing, rising from a seated position, bending at the waist, holding household items, driving, and getting dressed, due to arthritis-related pain in her hips, hands, and

---

[1] Bartlett protectively filed an application for Supplemental Security Income on May 25, 2010, originally alleging a disability onset date of May 12, 2002. During the administrative hearing held on June 25, 2012, which is discussed below, Bartlett's counsel moved to amend the alleged disability onset date to June 22, 2011. In his written decision, the ALJ determined that Bartlett was not disabled as of the protective filing date. *See infra* Part II.B. Bartlett seeks remand for an immediate payment of benefits as of the protective filing date or, alternatively, the amended disability onset date. (Pl.'s Br. at 27.)

feet. Bartlett described her typical day as consisting of cooking breakfast whenever possible, taking her pain medication, sending her grandchildren off to school, gardening and working in the yard when she is having "a better day," and cleaning and preparing dinner with the assistance of her grandchildren. (Tr. 189.)

On August 18, 2010, Bartlett was seen by Dr. Derrick Sorweide ("Dr. Sorweide") for a comprehensive orthopedic examination. Despite complaints of chronic and debilitating pain due to arthritis and bursitis, Dr. Sorweide's examination revealed that Bartlett was in "no acute distress," was able to sit, stand, and walk without difficulty, had no swelling in her hands, wrists, elbows, shoulders, ankles, knees, or hips, was "able to get her fingers to touch her toes while standing with [her] legs straight," and evidenced "[l]ots of symptom exaggeration" and "[p]oor motivation." (Tr. 258.) Dr. Sorweide ultimately concluded that Bartlett was capable of working on a full-time basis, and suggested that Bartlett might be malingering:

> This is a patient with nothing in her history or physical to imply any limitation in her ability. Her story just does not add up. Stopping smoking, exercise, [nonsteroidal anti-inflammatory drugs] and antidepressants should be used. There is no indication here for narcotic use. . . . Her 'asthma' is from smoking, and for now is nonlimiting.
>
> Based on History and Physical, patient can work [eight-hour] days and [forty] hour weeks. . . .

(Tr. 258; *see also* Tr. 256.)[2]

---

[2] "Medical opinions that predate the alleged onset of disability are of limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (citation omitted). That does not mean, however, that such opinions should simply be disregarded by the ALJ or reviewing court. *See, e.g., Williams v. Astrue*, 493 F. App'x 866, 868-69 (9th Cir. 2012) (concluding that the ALJ erred in failing to consider three medical reports that predated the alleged onset of disability, but nevertheless upholding the denial of benefits because the error proved to be harmless). That is especially true where, as here, the claimant asks for a calculation of benefits as of the protective filing date (which predates relevant medical opinion evidence), or, alternatively, the amended alleged disability onset date (which postdates such evidence).

Eight days later, on August 26, 2010, Dr. Richard Alley ("Dr. Alley"), a non-examining state agency medical consultant, reviewed Bartlett's medical records. Dr. Alley concluded that Bartlett did not suffer from an "[i]mpairment or combination of impairments [that would] significantly limit [her] physical or mental ability to do basic work activities." (Tr. 64.) Dr. Alley also noted that Bartlett's subjective complaints were disproportionate to the objective evidence and Bartlett's activities of daily living.

Bartlett presented for a follow-up visit with Dr. Pilcher on August 31, 2010. According to Dr. Pilcher's treatment records, Bartlett appeared "well-nourished, well developed, alert, in no acute distress" upon physical examination, and she denied experiencing joint or hip pain. (Tr. 264.) Dr. Pilcher noted that Bartlett's arthritis "mainly affects her hands/feet/knees," and "instructed [Bartlett] to exercise regularly." (Tr. 263-64.)

On October 5, 2010, Bartlett underwent an x-ray of her left foot, which revealed "a transverse partially healed fracture near the base of the fifth metatarsal bone." (Tr. 268.) When Bartlett presented for a follow-up visit with Dr. Pilcher on October 20, 2010, she reported decreased pain in her left foot with the use of an orthopedic shoe. She also reported that she suffered the injury about a week before the x-ray. Dr. Pilcher instructed Bartlett to wear a low-top walking boot for the next four weeks.

Bartlett was seen for a follow-up visit with Dr. Pilcher on December 1, 2010. Bartlett reported an increase in arthritis-related pain and asked to use Vicodin more frequently throughout the day. Dr. Pilcher declined to alter Bartlett's Vicodin prescription and instructed her to begin a low-fat diet and exercise on a regular basis.

Page 4 - OPINION AND ORDER

On January 6, 2011, Dr. Linda Jensen ("Dr. Jensen"), a non-examining state agency medical consultant, reviewed the medical treatment records in Bartlett's file. Dr. Jensen recommended the affirmance of the Commissioner's initial decision to deny Bartlett's application for Supplemental Security Income, because she determined that Bartlett's condition was non-severe, and that Bartlett's subjective complaints were disproportionate to the objective medical evidence of record and Bartlett's activities of daily living.

On October 11, 2011, Bartlett visited Dr. Pilcher's office and complained of increased pain and swelling in her left foot. Dr. Pilcher noted that Bartlett appeared in no acute distress upon physical examination, but there was a "large tender lump on [the] top of her [left] foot." (Tr. 330.) Bartlett returned to Dr. Pilcher's office about two weeks later to discuss her pending application for Supplemental Security Income. In his progress note, Dr. Pilcher stated, among other things, that Bartlett "has too much pain [so] she has to take [V]icodin daily [and would be] unable to focus on [a] job as a result," and that he felt Bartlett was "significantly disabled due to general osteoarthritis." (Tr. 331-32.)

During a consultation on January 27, 2012, Dr. Pilcher informed Bartlett that "her insurance want[ed] her to have [appointments] for her medications." (Tr. 340.) Bartlett expressed some concern "about swelling in her fingers at times." (Tr. 340.) Bartlett underwent x-rays of both hands shortly thereafter, which revealed "osteoarthritic change at the base of each thumb . . . more prominent on the left than the right." (Tr. 343.) She also underwent an x-ray of the lumbar spine, which revealed "preservation of the stature of the lumbar vertebral bodies," with "minor spondylolytic spurring the lower thoracic and upper lumbar levels," as well as "mild to moderate disk [sic] space narrowing at L5-S1." (Tr. 344.)

Page 5 - OPINION AND ORDER

Bartlett had a follow-up visit with Dr. Pilcher on April 24, 2012. Bartlett reported "severe pain in the back of her right knee off and on," but acknowledged that the combination of prednisone and Vicodin "seem[ed] to help her pain issues."[3] (Tr. 352.) Bartlett presented with "severe [posterior] *left* knee pain" upon physical examination. (Tr. 353) (emphasis added). Dr. Pilcher's office provided Bartlett with an early refill of her husband's prescription for hydrocodone, but informed Bartlett that her husband's prescription would "not be refilled early next time." (Tr. 353.)

Dr. Pilcher completed a Physical Residual Functional Capacity Questionnaire ("PRFCQ") on June 7, 2012, regarding Bartlett's physical impairments. Dr. Pilcher noted that he had been treating Bartlett for approximately seven years, that Bartlett had been diagnosed with osteoarthritis, and that Bartlett experiences severe pain on a daily basis in her feet, hips, hands, and back, as evidenced by "weak grip strength, stumbl[ing] occasionally, [and] poor balance." (Tr. 354.) Dr. Pilcher indicated that Bartlett was not a malingerer, would need unscheduled breaks every ten to fifteen minutes and could sit, stand, and walk for less than two hours during an eight-hour workday, was incapable of performing "even 'low stress' jobs," did not need to use a cane, and could never lift twenty pounds and rarely lift ten pounds or less. (Tr. 354-56.)

An Administrative Law Judge ("ALJ") convened a video hearing on June 25, 2012, at which Bartlett testified about the physical limitations resulting from her impairments. Bartlett stated that she did not believe she was capable of returning to full-time, competitive employment. Bartlett explained that she suffers from painful arthritis in her feet, hands, and hips, which negatively affects her ability to sit, stand, walk, reach overhead, climb stairs without slipping, kneel, grasp with either

---

[3] "Prednisone is a synthetic derivative of cortisone used primarily for its anti-inflammatory effects and its modification of immune responses." *Champion v. S&M Traylor Bros.*, 690 F.2d 285, 289 n.8 (D.C. Cir. 1982).

hand, operate a motor vehicle, shop for groceries, get dressed, tie her shoes, write, comb her hair, and consistently attend her grandson's cello concerts, parent-teacher conferences, and doctor appointments. Bartlett also noted that she experiences some auditory limitations from an unspecified birth defect, but does not wear hearing aids. She estimated that she needs to rotate between seated and standing positions every five to ten minutes due to arthritis-related pain; that her pain would cause her to arrive late or miss work on a weekly basis; and that, at a minimum, she would need unscheduled breaks every ten to fifteen minutes during an eight-hour workday.

The ALJ posed four hypotheticals to a vocational expert ("VE") who testified at Bartlett's hearing. First, the ALJ asked the VE to assume that a hypothetical worker could stand, sit and walk about six hours in an eight-hour workday, lift ten pounds frequently and occasionally lift twenty pounds, operate non-forceful foot controls such as an accelerated pedal or brake, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The hypothetical worker, however, was precluded from operating any forceful foot controls (e.g., controls that required "constant" or "a great deal of" pressure) and climbing ladders, ropes, and scaffolds, and needed to avoid work environments with loud background noise and exposure to hazards such as heights and dangerous moving machinery. (Tr. 54.) The VE testified that the hypothetical worker could maintain Bartlett's prior work as a general clerk.

Second, the ALJ asked the VE to assume that the general clerk job did not qualify as past relevant work experience and to identify whether there were other appropriate occupations for a hypothetical worker of Bartlett's age, education, and work experience. The VE testified that the hypothetical worker could be employed as a general cashier, fast food worker, or cafeteria attendant. The VE classified these positions as light, unskilled jobs with Specific Vocational Preparation

("SVP") levels of two.[4] The VE further testified that there were 335,000 general cashier jobs in the national economy, including 1,000 jobs in the regional economy of Medford, Oregon; two million fast food worker jobs in the national economy, including 2,000 jobs in the regional economy; and 130,000 cafeteria jobs in the national economy, including 300 jobs in the regional economy.

Third, the ALJ asked the VE to assume that the hypothetical worker described above was limited to standing and walking no more than two hours in an eight-hour workday, instead of six. The VE testified that the hypothetical worker could still be employed as an electronics worker, bench assembler, and products assembler. The VE classified these positions as light, unskilled jobs with an SVP level of two. The VE stated that there were 44,000 electronics worker jobs in the national economy, including 100 in the regional economy; 48,000 bench assembler jobs in the national economy, including 100 in the regional economy; and 44,000 production assembler jobs, including 100 jobs in the regional economy. The VE testified that the production assembler jobs base would be eroded by fifty percent due to the need to avoid environments with loud background noise, and confirmed that production assembler jobs are essentially bench-type work that could be performed either sitting or standing.

Fourth, and finally, the ALJ asked the VE how the physical limitations identified by Dr. Pilcher's PRFCQ (i.e., that Bartlett is capable of sitting, standing, or walking for less than two hours during an eight-hour workday), would impact the ability of the hypothetical worker to perform the

---

[4] An "SVP 'is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bayer v. Colvin*, 557 F. App'x 280, 284 n.2 (5th Cir. 2014) (citation omitted).

previously-identified positions. The VE testified that the physical limitations identified by Dr. Pilcher's PRFCQ would preclude the performance of substantial gainful activity.

In a written decision issued on August 20, 2012, the ALJ applied the five-step sequential process set forth in 20 C.F.R. § 416.920, and found that Bartlett was not disabled within the meaning of the Social Security Act. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Bartlett's petition for review, making the ALJ's decision the Commissioner's final decision. Bartlett timely appealed to the federal district court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.   Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, then the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.    The ALJ's Decision**

At the first step of the five-step sequential process, the ALJ found that Bartlett had not engaged in substantial gainful activity since her application date of May 25, 2010. At the second step, the ALJ found that Bartlett had the medically determinable impairments of osteoarthritis and degenerative disc disease of the lumbosacral spine, asthma, hyperlipidemia, osteoarthritis of the hands, and a fracture near the base of the fifth metatarsal of the left foot.

At the third step, the ALJ found that Bartlett's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Bartlett's residual functional capacity ("RFC") and found that she could lift ten pounds frequently and twenty pounds occasionally, stand, sit, and walk for up to six hours in an eight-hour workday, and occasionally operate non-forceful foot controls, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Bartlett is not capable, however, of climbing ladders, ropes, or scaffolds, operating forceful foot controls that require constant pressure, or working in an environment with loud background noise. She must also avoid work involving hazards such as unprotected heights and dangerous moving machinery.

At the fourth step, the ALJ concluded that Bartlett was capable of performing past relevant work as a general clerk, as the position did not require Bartlett to perform any work-related activities that were precluded by her RFC. Although the ALJ's step-four finding was sufficient to conclude that benefits should be denied, the ALJ proceeded to the fifth step and found, as an alternative reason to deny Bartlett's application for Supplemental Security Income, that there were other jobs existing in significant numbers in the national economy that Bartlett could perform, including work as a general cashier (DOT 211.462-010), fast food worker (DOT 311.472-010), and cafeteria attendant (DOT 311.677-010). Based on these findings, the ALJ concluded that Bartlett was not disabled within the meaning of the Social Security Act.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its

judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Bartlett argues that the ALJ: (1) improperly rejected the opinion of her treating physician, Dr. Pilcher; (2) failed to provide clear and convincing reasons for discrediting Bartlett's subjective symptom testimony; and (3) failed to credit the testimony of the VE in response to the only hypothetical question that Bartlett contends accurately reflected her functional limitations, namely, the ALJ's fourth hypothetical premised on Dr. Pilcher's PRFCQ.

For the reasons discussed below, this Court finds that the ALJ's findings are supported by substantial evidence, and that the ALJ did not commit any legal error. Accordingly, the Court affirms the Commissioner's decision denying benefits.

### A.    Medical Opinion Evidence

The Court first turns to Bartlett's argument that the ALJ erred in discounting Dr. Pilcher's opinion. "There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). To reject the opinion of a treating physician in favor of a conflicting opinion from an examining physician, "an ALJ still must 'make[ ] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Id.* (quoting *Thomas*, 278 F.3d at 957).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). But "[t]he ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* Indeed, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

Here, Bartlett presented for a follow-up visit with her treating primary care physician, Dr. Pilcher, in late October 2011, in order to discuss her pending application for Supplemental Security Income. Dr. Pilcher stated, among other things, that Bartlett "has too much pain [so] she has to take [V]icodin daily [and would be] unable to focus on [a] job as a result," and that he felt Bartlett was "significantly disabled due to general osteoarthritis." (Tr. 331-32.) Most relevant to this appeal, Dr. Pilcher also completed a PRFCQ in early June 2012, wherein he noted that Bartlett was not a malingerer, would need unscheduled breaks every ten to fifteen minutes and could sit, stand, and walk for less than two hours during an eight-hour workday, was incapable of performing "even 'low stress' jobs," did not need to use a cane, and could never lift twenty pounds and rarely lift ten pounds or less. (Tr. 354-56.)

Dr. Pilcher's opinion was controverted by both Dr. Sorweide and the non-examining state agency medical consultants. Accordingly, the ALJ was only required to provide specific, legitimate reasons for rejecting it. *Valentine*, 574 F.3d at 692. Specific, legitimate reasons for rejecting a

physician's opinion may include its inconsistency with other medical evidence in the record; its inconsistency with the physician's own treatment notes; the fact that it is based to a large extent on a claimant's properly discredited subjective complaints; its inconsistency with a claimant's daily activities; the fact that it is conclusory, brief, and unsupported by the record as a whole or by objective medical findings; its inconsistency with the claimant's testimony; the fact that the claimant's impairments can be effectively controlled with medication; and the claimant's failure to follow the physician's prescribed course of treatment. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Clevenger v. Colvin*, 582 F. App'x 709, 710 (9th Cir. 2014); *Rusten v. Comm'r of Soc. Sec. Admin.*, 468 F. App'x 717, 720 (9th Cir. 2012); *Carillo v. Comm'r of Soc. Sec.*, No. 1:10–cv–01828, 2012 WL 3639117, at *7 (E.D. Cal. Aug. 23, 2012); *Ranier v. Colvin*, No. 6:11–cv–06296–SI, 2013 WL 1809745, at *7 (D. Or. Apr. 29, 2013).

The ALJ gave "little weight" to Dr. Pilcher's October 2011 opinion, and his June 2012 PRFCQ. (Tr. 25.) The ALJ did not err in doing so, because he provided several specific, legitimate reasons for rejecting Dr. Pilcher's opinion, and the ALJ's reasons are supported by substantial evidence in the record.

First, the ALJ pointed out that Dr. Pilcher's opinion was inconsistent with other medical evidence in the record. The most notable example was the orthopedic examination conducted by Dr. Sorweide. *Cf. Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (stating that a consultative examiner's opinion on its own constituted substantial evidence for rejecting a treating physician's opinion, because it rested on an independent examination of the claimant); *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) ("To the extent that other physicians' conflicting

Page 14 - OPINION AND ORDER

opinions rested on independent, objective findings, those opinions could constitute substantial evidence."). Contrary to Dr. Pilcher's opinion, Dr. Sorweide concluded that Bartlett was able to sit, stand, and walk without difficulty, and evidenced "[l]ots of symptom exaggeration" and "[p]oor motivation." (Tr. 258.) Dr. Sorweide ultimately concluded that Bartlett was capable of working on a full-time basis and suggested that Bartlett might be malingering: "This is a patient with nothing in her history or physical to imply any limitation in her ability. Her story just does not add up. . . . Based on [a review of the medical] [h]istory and [her] [p]hysical, [the] patient can work [eight-hour] days and [forty] hour weeks." (Tr. 258.)

Second, the ALJ identified inconsistencies between Dr. Pilcher's disability opinion and his own treatment records: "Dr. Pilcher's opinions are not supported his . . . own treatment records[.] . . . Indeed, as noted, Dr. Pilcher provided only conservative treatment and merely adjusted the claimant's medications at her request most of the time, as well as advising her to exercise. Further, the examinations were essentially unremarkable[.]" (Tr. 25) (citations omitted). For example, Dr. Pilcher opined that Bartlett "is significantly disabled due to her general osteoarthritis," despite the fact that Dr. Pilcher routinely described Bartlett as "well-nourished, well developed, alert, [and] in no acute distress" (i.e., unremarkable examinations), and encouraged Bartlett to engage in exercise on a regular basis. (Tr. 264, 300, 318, 327, 332, 335, 341.) These are not the types of treatment notes that would accompany a finding that Bartlett is "significantly disabled." *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (upholding rejection of treating physician's opinion and making an analogous observation, where the physician described the claimant as a "well developed, well nourished middle aged female in no acute distress, and prescribed a conservative course of treatment, including a recommendation to avoid strenuous activities") (brackets and

internal quotation marks omitted).[5] The ALJ's reliance on the inconsistencies between Dr. Pilcher's

opinion and his own treatment records was a reasonable interpretation of the record, supported by

substantial evidence.

Third, the ALJ noted instances where Bartlett failed to follow Dr. Pilcher's prescribed course

of treatment. For example, when Bartlett presented with swelling and a lump on her left foot in mid-

October 2011, roughly four months post-amended alleged disability onset date, Dr. Pilcher advised

Bartlett to consult with a podiatrist and to obtain an x-ray of her left foot. (Tr. 330.) As the ALJ

noted, "[t]he record contains no indication that the claimant followed-up on this recommendation."

(Tr. 24.) Similarly, when Bartlett presented with left posterior knee pain in late April 2012, which

allegedly interfered with Bartlett's ability to walk and maintain a standing position, Dr. Pilcher

ordered an orthopedic consultation and an x-ray on Bartlett's left knee. (Tr. 352-53.) The ALJ once

again noted that "[t]he record does not contain evidence that these recommendations were carried

out." (Tr. 24.) Bartlett's apparent failure to follow the prescribed course of treatment undermines the

intensity and persistence of the limitations identified by Dr. Pilcher.

Fourth, the ALJ noted that Dr. Pilcher appeared to be advocating for Batlett to receive

benefits, as opposed to simply treating her. *See Buckner-Larkin v. Astrue*, 450 F. App'x 626, 628

(9th Cir. 2011) (upholding rejection of treating physician's opinion based, in part, on the fact that

he "appeared to be more of an advocate than an objective examiner," which constituted a specific

and legitimate reason for discounting his opinion); *Bagoyan Sulakhyan v. Astrue*, 456 F. App'x 679,

---

[5] There is nothing in Dr. Pilcher's treatment notes to suggest that he ever withdrew his recommendation to engage in regular exercise. Even assuming Dr. Pilcher recommended that Bartlett avoid strenuous activities, as opposed to engaging in regular exercise, *Rollins* would still apply and lend support to the ALJ's rejection of Dr. Pilcher's opinion.

682 (9th Cir. 2011) (upholding rejection of a non-treating physician's opinion, and noting that "[t]he ALJ [concluded that his] reports contained an advocate's tone rather than that of a treating physician."). Indeed, as the ALJ noted, "if the claimant actually required any limitations posed by this doctor, they would have been regularly recorded in the treatment notes." (Tr. 25.) Dr. Pilcher's PRFCQ and his treatment notes suggest that for the most part, he simply accepted Bartlett's subjective complaints. In light of the ALJ's proper rejection of Bartlett's subjective symptom testimony, as explained below, it necessarily follows that Dr. Pilcher's opinion should be discounted to the extent he relied solely on Bartlett's subjective symptom testimony.

Even if this Court does not agree with the totality of the ALJ's interpretations of the medical evidence in this case, the ALJ did provide several specific and legitimate reasons for discounting Dr. Pilcher's opinion, and supported those reasons with substantial evidence in the record. *See DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176 (9th Cir. 2009) (finding harmless error where "the ALJ gave several specific and legitimate other reasons supported by substantial evidence for rejecting [the treating physician]'s opinion that [the claimant] was disabled."); *see also Damrill v. Colvin*, Civil No. 1:13–cv–01109–JE, 2015 WL 1021397, at *10 (D. Or. Mar. 6, 2015) ("Because the ALJ provided at least one specific and legitimate reason for discounting Dr. Causeya's opinion, any error in providing the invalid reasons discussed above was harmless."). Where conflicting medical evidence is amenable to more than one rational interpretation, the district court cannot substitute its own judgment for that of the ALJ. *See Olds v. Comm'r of Soc. Sec.*, No. 3:13-cv-00849-HZ, 2014 WL 3670175, at *5 (D. Or. July 22, 2014). Accordingly, this Court affirms the ALJ's interpretation of the medical evidence.

**B.      Subjective Symptom Testimony**

Bartlett also argues that the ALJ improperly discounted her subjective symptom testimony. The ALJ concluded that Bartlett's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but he found Bartlett's statements concerning the intensity, persistence and limiting effects of those symptoms not credible. The ALJ did not err in doing so.

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas*, 278 F.3d at 959.

Bartlett initially argues that the ALJ committed legal error by finding her subjective complaints incredible, "to the extent that they are inconsistent with the [her] residual functional capacity assessment." (Tr. 26.) This is boilerplate language used in many written ALJ decisions, and the ALJ's use of such language was not legal error under the circumstances presented here. Bartlett is correct that an ALJ may not simply define an RFC and then, without more, conclude that the claimant's testimony is only credible to the extent it aligns with the RFC. However, "[t]here is nothing wrong with an ALJ stating a conclusion and then explaining it, as opposed to providing explanation and then reaching a conclusion." *Black v. Astrue*, 10–cv–06409–MO, 2011 WL 6130534, at * 6 (D. Or. Dec. 7, 2011). "In other words, the ALJ does not err simply by noting that a claimant's testimony is not credible to the extent it is inconsistent with the RFC where that conclusion is followed by sufficient reasoning [for discounting the claimant's subjective symptom testimony]." *Veach v. Comm'r Soc. Sec. Admin.*, No. 3:12–cv–00679–MA, 2013 WL 3479508, at *5 (D. Or. July 10, 2013) (citation omitted).

As the parties seem to agree, because the ALJ did not make an express finding that Bartlett
was malingering, he was required to provide clear and convincing reasons for discounting Bartlett's
subjective complaints. The ALJ met this burden.

First, the ALJ found Bartlett not credible based on her daily activities that were incompatible
with the severity of alleged symptoms and degree of impairment:

> [T]he claimant has described daily activities that are not limited to the extent one
> would expect, given the complaints of disabling symptoms and limitations. For
> instance, the claimant alleged significantly limited daily activities due to chronic
> pain. However, she also stated that she is the guardian of her grandchildren, ages
> [ten] and [twelve], and she pushes herself to attend most of their school functions.
> The claimant also admitted that she cleans up around the house, tries to work in the
> yard, and makes dinner for her grandchildren, although she takes breaks.

(Tr. 27) (citations omitted). While Bartlett argues that Social Security claimants need not be "utterly
incapacitated" in order to be found disabled, and that they "should not be penalized for attempting
to lead normal lives or rising heroically to the demands of daily family life" (Pl.'s Br. at 24-25),
Bartlett fails to explain adequately how her ability to care for her two grandchildren, for example,
is compatible with the severity of her alleged symptoms and physical limitations. *Cf. Rollins*, 261
F.3d at 857 (finding clear and convincing reasons for discrediting claimant based on, *inter alia*,
incompatible daily activities like attending to the needs of her two young children); *Molina*, 674 F.3d
at 1113 ("Even where those activities suggest some difficulty functioning, they may be grounds for
discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating
impairment.").

Second, the ALJ cited to the conflicting medical opinions offered by Drs. Sorweide, Jensen,
and Alley as grounds for discounting Bartlett's subjective complaints. All three of these medical
doctors disagreed with Bartlett's claim that she is permanently disabled. In fact, Dr. Sorweide

concluded that Bartlett's "story just does not add up." (Tr. 258.) Dr. Sorweide also noted that Bartlett (1) could sit, stand, walk, lift, carry, and handle objects without limits, (2) had full range of motion and was pain-free in her wrists, elbows, shoulders, ankles, knees, and hips, (3) had full range of motion in her c-spine and l-spine, (4) was able to lift her legs off the examination table from a seated position, and (5) was able to get her fingers to touch her toes while standing with her legs straight. These capabilities are inconsistent with Bartlett's subjective complaints. Indeed, in the Adult Function Report completed one month before Dr. Sorweide's examination, for example, Bartlett claimed that she rarely bathes because "bending was so painful," and that she cannot "hold [her] hands [and] arms up" to style her own hair. (Tr. 190.)

Third, the ALJ also discredited Bartlett's testimony based on her symptom exaggeration, poor motivation, and poor recall. *Cf. Tonapetyan*, 242 F.3d at 1148 (noting that inconsistent statements and a tendency to exaggerate symptoms constitute specific, clear and convincing reasons for discounting a claimant's subjective symptoms testimony). Substantial evidence supports this determination. In addition to the observations previously described concerning inconsistencies in the record, the Court notes that Bartlett consistently denied muscle pain (myalgia) during consultations with Dr. Pilcher, yet the Pain and Fatigue Questionnaire she completed in support of her application for Supplemental Security Income states that her "whole body has pain [in the] muscles [and] joints." (Tr. 196.)

In addition to the foregoing, the ALJ provided several other clear and convincing reasons for rejecting Bartlett's subjective symptom testimony. The ALJ noted that Bartlett had a poor work record and showed little propensity to work. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) ("The ALJ gave specific, clear and convincing reasons for discounting [claimant's]

Page 21 - OPINION AND ORDER

testimony. . . . [T]he ALJ found that [claimant] had an 'extremely poor work history' and 'has shown little propensity to work in her lifetime,' which negatively affected her credibility regarding her inability to work."). Additionally, the ALJ cited unremarkable medical evidence and conservative treatment records as bases to reject Bartlett's subjective symptom testimony. For example, an x-ray of Bartlett's back showed only mild to moderate changes. *Cf. Middleton v. Astrue*, No. 6:12-cv-00540-SI, 2013 WL 1414882, at *6 (D. Or. Apr. 8, 2013) (making a similar observation in upholding adverse credibility determination). Bartlett also undertook only conservative treatment to treat her arthritis-related pain (Vicodin), which proved to be effective. *See Walter v. Astrue*, No. 09-1569, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (upholding adverse credibility determination because the plaintiff sought only conservative treatment, including Vicodin and physical therapy); *Medel v. Colvin*, No. 13-2052, 2014 WL 6065898, at *8 (C.D. Cal. Nov. 13, 2014) (collecting cases similar to *Walter* determining that the use of Vicodin is a "conservative" treatment); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (an ALJ may infer that pain is not disabling if claimant seeks only minimal conservative treatment); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.").

Bartlett counters that an ALJ's adverse credibility determination cannot be based solely on a lack of medical evidence. *See, e.g., Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."). The ALJ in this case, however, based his adverse credibility

Page 22 - OPINION AND ORDER

determination only in part on a lack of medical support. *See Burch v. Barnhart*, 400 F.3d 676, 681

(9th Cir. 2005) ("Although lack of medical evidence cannot form *the sole basis* for discounting pain

testimony, it is a factor that the ALJ can consider in his credibility analysis.") (emphasis added). The

ALJ did not err in so doing.

Bartlett also contends that the Commissioner has failed to explain how the x-ray showing

mild to moderate changes constitutes a clear and convincing reason for rejecting the credibility of

Bartlett's subjective complaints of pain. *Burch* and *Middleton*, however, instruct that a lack of

corroborating medical evidence is an appropriate factor for an ALJ to consider in his credibility

analysis. To the extent Bartlett suggests otherwise, the Court disagrees.

In short, the Court concludes that the ALJ provided several specific, clear, and convincing

reasons in support of his adverse credibility determination.[6] The ALJ's interpretation of Bartlett's

testimony and the medical records were reasonable. The ALJ's interpretation "may not be the only

reasonable one[,]" "[b]ut it is still a reasonable interpretation and is supported by substantial

evidence; thus, it is not [the Court's] role to second-guess it." *Rollins*, 261 F.3d at 857 (citation

omitted); *see also McKillop v. Astrue*, No. 3:11–cv–01257–SI, 2013 WL 76284, at *5 (D. Or. Jan.

4, 2013) ("The reviewing court must defer to an ALJ's reasonable interpretation of a claimant's

---

[6] The Court does not agree that Bartlett's statement about alcohol, standing alone, was a clear and convincing reason for discounting her testimony. The ALJ, however, is entitled to use ordinary techniques of credibility determination, and the ALJ's consideration of Bartlett's inconsistent statements about alcohol use was appropriate. *See Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (relying on inconsistent statements about alcohol use to reject claimant's testimony); *see also Sandoval v. Colvin*, No. 13-0482, 2014 WL 4854565, at *12 (C.D. Cal. Sept. 30, 2014) ("[T]o the extent that the ALJ may have erred in discrediting plaintiff's subjective symptom testimony . . . , the error is harmless, because the ALJ cited other clear and convincing reasons for her credibility determination.") (citation omitted).

statements and activities, even if there may be an alternative explanation that is more favorable to the claimant.").

**C.        The VE Hypothetical**

Finally, Bartlett argues that the ALJ failed to credit the testimony of the VE in response to the only hypothetical question that Bartlett contends accurately reflected her functional limitations, namely, the ALJ's fourth hypothetical premised on Dr. Pilcher's PRFCQ. This argument is predicated on the arguments set forth above, which the Court has rejected.

## V. CONCLUSION

For the reasons stated, the Court affirms the Commissioner's decision denying Bartlett's application for Supplemental Security Income.

IT IS SO ORDERED.

Dated this   21st   day of May, 2015.

_____
STACIE F. BECKERMAN
United States Magistrate Judge